

NORTHERN DISTRICT OF TEXAS
FILED
JUL - 2 2010
CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PATSY HUDSPETH,
    PLAINTIFF,

v.                    §   CIVIL ACTION NO. 4:09-CV-156-Y

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
    DEFENDANT.

§ § § § § § § § § §

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

## I. FINDINGS AND CONCLUSIONS

A.    Statement of the Case

Plaintiff Patsy Hudspeth ("Hudspeth") filed this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits under Title II and supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA").  In August 2004,[1] Hudspeth applied for disability insurance and SSI benefits alleging

---

[1] The Court notes that the undated applications have the date October 26, 2004 printed at the top of the applications.  (Tr. 126-30, 502-04.)  However, the ALJ, at the hearing, stated that Hudspeth filed her applications in August 2004 and Hudspeth did not disagree with this statement.  (Tr. 553.)

1

that she became disabled on September 1, 2003.[2]  (Transcript ("Tr.") 20, 126-30, 502-04, 553.)

Her applications were denied initially and on reconsideration.  (Tr. 66-70, 73-79, 509-20; see Tr.

71.)  The ALJ held a hearing on May 24, 2006 and issued a decision on September 27, 2006 that

Hudspeth was not disabled.  (Tr. 20, 45-53, 524-63.)  Hudspeth filed a written request for review

(Tr. 115-16), and the Appeals Council, on April 20, 2007, vacated the ALJ's decision and

remanded the case for further evaluation of, inter alia, the source opinion of a nurse practitioner,

Hudspeth's credibility, and some new evidence.  (Tr. 20, 56-59.)  Hudspeth also filed duplicate

concurrent disability applications under Title II and XVI, which have been consolidated with the

previously filed claims.  (Tr. 20.)  The ALJ held a second hearing on April 15, 2008 and issued a

decision on May 29, 2008 that Hudspeth was not disabled because she was capable of

performing her past relevant work.  (Tr. 17-37.)  Hudspeth filed a written request for review, and

the Appeals Council denied her request for review, leaving the ALJ's decision to stand as the

final decision of the Commissioner.  (Tr. 9-12, 15.)

B.      Standard of Review

        Disability insurance is governed by Title II, 42 U.S.C. § 404 et seq., and SSI benefits are

governed by Title XVI, 42 U.S.C. § 1381 et seq., of the SSA.  In addition, numerous regulatory

provisions govern disability insurance and SSI benefits.  See 20 C.F.R. Pt. 404 (disability

insurance); 20 C.F.R. Pt. 416 (SSI).  Although technically governed by different statutes and

regulations, "[t]he law and regulations governing the determination of disability are the same for

---

        [2] In her application, Hudspeth claimed that she became disabled on March 26, 2003.  (Tr. 26, 126, 139.)
However, at the hearing before the ALJ on April 15, 2008, Hudspeth amended the onset day to September 1, 2003.
(Tr. 579.)

both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other

gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

C.   <u>Issues</u>

1.   Whether substantial evidence supports the ALJ's decision at Step Two that Hudspeth's mental impairments are not severe.

2.   Whether substantial evidence supports the ALJ's assessment of Hudspeth's residual functional capacity ("RFC").

D.    Administrative Record

1.    Relevant Treatment History[3]

Hudspeth was frequently treated by Rachel Hilliard ("Hilliard"), a nurse practitioner from approximately 2002 through 2005, for, *inter alia*, back pain. From July through October 2002, Hudspeth complained that she had been under a lot of stress due to issues with her son and at her job. (Tr. 297-99.) Hudspeth reported in March 2003 that she had injured her back while moving tables at work. (Tr. 293.) On August 1, 2003, Hilliard noted that Hudspeth was very upset about problems that she was having at work but that she did not "want any 'pills' to 'medicate her problem at work'." (Tr. 292; *see* Tr. 328.) Thereafter, on August 21, 2003, Hudspeth reported to Hilliard that she continued to have increased stress in the workplace. (Tr. 291.) In September 2003, Hilliard treated Hudspeth for a severe headache. (Tr. 288.) Hilliard noted that Hudspeth was crying and sobbing and diagnosed her with acute anxiety. (*Id.*; *see* Tr. 289-90.)[4]

In a Physical Residual Functional Capacity Assessment ("PRFC") dated December 2, 2004, Albert Ponterio ("Ponterio"), M.D., opined that Hudspeth could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; sit, stand and/or walk for a total of about six hours in an eight-hour workday; and had the unlimited ability to push and/or pull. (Tr. 226; *see* Tr. 225-32.) Ponterio also opined that Hudspeth did not have any postural, manipulative (which includes reaching in all directions), visual, communicative, or environmental limitations. (Tr. 227-29.)

---

[3] The Court will only include the treatment history that relates to the specific issues raised by Hudspeth in her brief and will not recite all evidence in the record.

[4] There are various references in the record indicating that Hilliard had prescribed Xanax to Hudspeth throughout 2004 and 2005. (*See, e.g.,* Tr. 219, 243, 251-53, 257, 259-67, 269-70, 272, 275, 279, 319.)

On January 12, 2005, Hilliard noted in treatment notes that Hudspeth was on "quite a bit of sedating medication" and that "[s]he remains unable to work at this time due to her chronic pain." (Tr. 259.) In a "Disability Report—Appeal" Form ("Disability Report") dated January 17, 2005, Hudspeth reported that she was taking Fioricet, Neurontin, Xanax which caused drowsiness, and Skelaxin which caused nausea and drowsiness. (Tr. 173.)

Hilliard opined in a "Medical Assessment of Ability to Do Work-Related Activities (Physical)" Form ("Medical Assessment"), dated February 20, 2005, that Hudspeth could occasionally lift and/or carry ten pounds for a maximum of two to three hours; stand, walk, or sit two to three hours in an eight-hour workday and for fifteen to twenty minutes without interruption; occasionally climb, balance, stoop, and crouch; and never kneel or crawl. (Tr. 254-55.) Hilliard further opined that Hudspeth's ability to reach, handle, feel, and push or pull were also affected by her physical impairments. (Tr. 256.) Hilliard stated that Hudspeth's pain limited her mobility and ability to perform job duties and that the pain medications Hudspeth was taking were sedating and would impede her ability to work. (Tr. 255; *see* Tr. 256.)

In a Daily Activity Questionnaire ("DAQ") received by the Disability Determination Services on March 4, 2005, Hudspeth reported that her physical problems limited her ability to sit, stand, walk, lift and carry, use her hands, bend, kneel and squat, climb, reach, drive a car, watch TV, use the phone, perform housework and yard work, and engage in recreational activities. (Tr. 169.)

In another Disability Report, dated April 2, 2005, Hudspeth indicated that she was currently taking Fioricet, Neurontin, Xanax which caused drowsiness, Skelaxin which caused nausea and drowsiness, and Celebrex which caused indigestion. (Tr. 164.) In treatment notes

6

dated May 30, 2006, Hilliard noted that Hudspeth was unable to work at this time due to pain

and "the required medications." (Tr. 386.)

On July 28, 2005, Hilliard stated:

> The patient comes in to discuss her migraines and she is having some abdominal pain at times but her biggest problem is her neck pain and the fact that she has not been able to work for the last two years. She has had cervical spine fusion and multiple visits with Dr. LeGrand. Dr. LeGrand apparently has released her for full duty. At this point the patient certainly is not ready for that. She cannot hold down a job. She takes daily medications. She can do maybe some phone type work or sit down desk type job which I seriously doubt she is going to get anywhere near here but even at that I do not know that she could hold up to more than a couple of hours because of her medications being so sedating and she has to have those. At this point she still has a lot of pain. I think her best bet is to go back to Dr. LeGrand. She needs to be re-evaluated and I think her best option at this point is to consider disability. I do not see any other options temporarily for her. Over the next year or so she may be able to improve enough that she possibly could return to work but at this point we just do not know that and she does need some help in the meantime.

(Tr. 249, 320.)  On July 29, 2005, Hilliard noted that Hudspeth required medications due to pain

in her back and neck and could not work because she was over-sedated at times.  (Tr. 319.)

In a Medical Assessment dated April 10, 2006, Hilliard opined that Hudspeth could

occasionally and frequently lift and/or carry no more than five pounds; stand and/or walk a total

of one to two hours in an eight-hour work day and no longer than one-quarter of an hour without

interruption; sit without interruption no longer than half an hour; never climb, balance, crouch,

kneel, or crawl; and occasionally stoop.  (Tr. 325.)  She further noted that Hudspeth's ability to

reach, handle, feel, and push and pull were affected by her physical impairments.  (Tr. 327.)

Hilliard opined that Hudspeth's "medication may cause mental sluggishness" as "she is unable to

go all day without pain meds." (Tr. 327; *see also* Tr. 336.)

7

On June 29, 2006, Hudspeth was seen by Norma Dozier ("Dozier"), M.D., for an initial office consultation for "[t]otal body pain." (Tr. 350, 405; *see* Tr. 350-51, 405-06.) Dozier noted that Hudspeth had a past history of headaches, heart murmur, arthritis, depression, and gallbladder disease, and that she was currently taking a variety of medications, including Lexapro. (Tr. 350.) In a "Review of Systems" section of her examination report, Dozier noted that Hudspeth's psychiatric system was "[n]egative for depression, mania or bipolar illnesses." (Tr. 350-51.)

In September 2006, Hilliard noted that Hudspeth was experiencing anxiety and that her grandmother had recently died. (Tr. 380, 457.) Hudspeth indicated in a "Patient Comfort Assessment Guide" ("Patient Guide") dated October 2, 2006 that she had chronic, severe pain in her neck, spine, fingers, feet, and toes. (Tr. 375.) She also noted that she was taking Neurontin, Valium, and Fioricet. (*Id.*)

In October 2006, Edwin Green ("Green"), M.D., a neurologist, evaluated Hudspeth for chronic neck pain and pain in the left extremity. (Tr. 425.) Green, noting that Hudspeth had been treated for depression and was currently taking, *inter alia*, Lexapro, diagnosed Hudspeth with cervical and lumbar radiculopathy. (*Id.*)

In another Patient Guide dated November 2, 2006, Hudspeth indicated that she had severe pain in her neck, left shoulder, mid to lower back, fingers, legs, and feet and that she was taking Neurontin, Methadone, and Dramamine that were causing her to have a variety of side effects. (Tr. 370-71, 450.) On December 7, 2006, Hudspeth indicated in another Patient Guide that she was having severe pain in her neck, shoulder, arms, hands, fingers, lower back, and right ribcage and hip. (Tr. 3 65, 447.) She reported that she currently took a variety of medications

that caused her to have multiple side effects, including nausea, vomiting, constipation, lack of appetite, tiredness, itching, nightmares, sweating, difficulty thinking, and insomnia. (Tr. 365-66, 447.)  She further indicated that these side effects ranged in severity from barely noticeable to very severe. (*Id.*)

Also on December 7, 2006, Hilliard noted that Hudspeth was suffering from depression and prescribed Lexapro. (Tr. 364; *see also* Tr. 412, 414, 417-18, 420, 435, 437-38, 440, 446, 466-67, 470, 474-75, 477, 498 (noting that Hudspeth was taking Lexapro or Cymbalta from October 2006 through April 2007).)  On December 22, 2006, Hilliard gave Hudspeth some samples of Cymbalta to try. (Tr. 363, 445.)  In treatment notes dated January 9, 2007, Hilliard again diagnosed Hudspeth with depression and controlled anxiety, and she gave Hudspeth more Cymbalta samples. (Tr. 362, 444.)

In a "Cervical Impairment Residual Functional Capacity Questionnaire", dated February 16, 2007, a neurologist opined that as a result of Hudspeth's physical impairments she could not walk any city blocks without rest or severe pain, she could sit or stand continuously for no more than twenty minutes at one time, she must be able to walk around every fifteen minutes, she would need to sometimes take unscheduled breaks during an eight-hour working day, she could never lift or carry any amount of weight, and she would be absent from work, on average, once or twice a month. (Tr. 356-59; *see* Tr. 27.)

Edward Brandecker ("Brandecker"), M.D., evaluated Hudspeth on November 1, 2007 for a disability evaluation. (Tr. 389-91.)  He noted that she sustained a work-related injury on March 28, 2003 and that she not been able to return to work since the injury. (Tr. 389.)  He also reported that she was taking a variety of medications, including Cymbalta. (*Id.*)  He diagnosed

9

her with "[s]tatus post anterior cervical fusion, C5/6" and "chronic pain syndrome." (Tr. 390.)

He further opined:

> The patient presents with complaints of severe limiting pain. Her initial pain initiated with a work injury and a pop in her mid back and she subsequently underwent anterior cervical fusion at C5/6. She had an unsuccessful outcome from surgery and has now developed generalized pain affecting the entire body except the chest wall and abdomen. She is fear avoidance of activity. She has reduced herself to less than sedentary activity levels. She has withdrawn from the normal household activities as well. She is on multiple sedating and habit-forming medications.
>
> Her most recent cervical and lumbar MRI studies failed to reveal any evidence of nerve root compression or radicular pain. The patient received significant reinforcement of her pain behavior from her mother. Her complaints of pain are out of proportion to her physical findings and diagnostic studies. She shows complete giveaway weakness on motor testing of the upper and lower extremities inconsistent with her ability to ambulate. Her cervical range of motion is much more restricted actively than passively. It is difficult to comprehend her self[-]perceived degree of functional limitations given her work injury and single level anterior cervical fusion.

(Tr. 390-91.)

In a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" Form, Brandecker opined that Hudspeth was "limited by chronic pain syndrome and self perceived disability" and could frequently lift and carry up to ten pounds, occasionally lift and carry from eleven to twenty pounds, and never lift or carry more than twenty-one pounds. (Tr. 393, 396.) He also stated that Hudspeth could sit for two hours without interruption and for a total of four hours in an eight-hour workday and stand and walk for thirty minutes without interruption and for a total of two hours in an eight-hour workday. (Tr. 394.) He further opined that Hudspeth could occasionally reach (including overhead and all other types of reaching), climb stairs and ramps, balance, and stoop, frequently handle, finger, feel, push and pull, and

operate foot controls, and never climb ladders or scaffolds, kneel, crouch, or crawl.  (Tr. 395-96.) He noted that due to her self-perceived disability, Hudspeth could not perform activities like shop or walk a block at a reasonable pace on rough or uneven surfaces.  (Tr. 398.)

    2.  Administrative Hearing

Hudspeth was born on September 13, 1952, and she has an associate's degree in criminal justice.  (Tr. 502, 527.)  At the May 24, 2006 hearing before the ALJ, Hudspeth testified that she injured her back at work in 2003 and that she had surgery on her back in 2004 that was not successful.  (Tr. 531, 533-34.)  She further stated that she experienced much pain as a result of her back and neck conditions and that the medications she was taking for the pain affected her memory.  (Tr. 534-35, 542-44.)  She testified that she received injections for the pain several times a month and that they caused her to be completely incapacitated for two days.  (Tr. 543.) She stated that the pain in her back radiates to her feet, arms, and hands and that she experiences numbness in her feet, arms, and hands.  (Tr. 547.)  She also reported that the pain caused her to have difficulty sitting, standing, walking, and lifting and that she can drive, make her bed, fold clothes, and cook meals if she can take breaks.  (Tr. 547-50.)  She further testified that she was taking medication for depression, which caused her to have a dry mouth, difficulties thinking and focusing, diarrhea, and occasional nausea.  (Tr. 552.)

At the April 15, 2008 hearing before the ALJ, Hudspeth testified that she had severe nerve damage that extended to the cervical area, spinal area, shoulders, hand, arms, feet, fingers and groin.  (Tr. 568.)  She further stated that she can only drive and walk short distances and that she uses a motorized shopping cart if she goes shopping.  (Tr. 569-70.)  She stated that her mother and brother do some of the shopping for her and that she is able to do a little cleaning and

some cooking if she is able to sit down.  (Tr. 569-71.)  She testified that she has difficulty dressing herself and gripping a steering wheel, cannot type, and can write very little because of the intense pain.  (Tr. 571-74.)  She stated that she takes Neurontin, Fioricet, and Meclizine, which make her extremely sleepy.  (Tr. 573.)

Ollie Raulston ("Raulston"), a medical expert ("ME"), also testified at the hearing.  (Tr. 576.)  He stated that she had been diagnosed with chronic cervical pain syndrome and chronic low back pain syndrome and that none of her impairments met or equaled any listing.  (Tr. 577.)  He further opined that she would be able to work at a sedentary level lifting ten pounds occasionally, less than ten pounds frequently, standing and walking for a total of four hours, occasionally climbing, balancing, kneeling, and reaching overhead with either or both arms, and never crawling, crouching, or stooping.  (Tr. 577.)  He testified that he agreed with Brandecker that Hudspeth's limitations were based on self-perceived disability and there is no evidence from the MRIs and x-rays that support her claimed degree and extent of pain.  (Tr. 578.)  He further stated, "[N]evertheless I feel because of her self[-]perceived disability, that it would be unlikely that she could hold down a gainful employment on a regular basis."  (Tr. 578.)

3.  ALJ Decision

The ALJ, in his May 29, 2008 decision, found that Hudspeth had not engaged in any substantial gainful activity since September 1, 2003, the alleged onset date of Hudspeth's disability.  (Tr. 21.)  He further found that Hudspeth had the severe impairment of degenerative disk disease causing chronic pain.  (Tr. 21.)  He noted that Hudspeth had also been diagnosed with migraine headaches, asthma, gallbladder disease status post surgical removal, depression and anxiety, but that such impairments were not severe.  (Tr. 21, 30-31.)  In reaching this

conclusion, the ALJ reviewed the evidence in the record. (Tr. 21-31.) He stated, as relevant to

the issues in this case, the following:

> In September 2003, when she has alleged that her disability began, the claimant sought treatment for a severe headache attributed to a migraine. She was crying and photophobic at that time, and she complained of significant and worsening problems at work. She was given Demerol for the headache and she was also diagnosed with a related anxiety reaction for which no medication was offered.
>
> . . . .
>
> Despite the absence of significant symptoms reported by the nurse upon examination, this source completed a form in February 2005 opining that the claimant could occasionally lift/carry 10 pounds, that she had returned to full weight-bearing status but could only stand/walk for 2 to 3 hours total in an 8-hour work day and for 15-20 minutes without interruption, that she could only sit for 2 to 3 hours total in an 8-hour work day and for 15-20 minutes without interruption, and that pain limited her mobility and limited her to occasionally climbing, balancing, stooping and crouching with no kneeling and crawling. The fact that she was taking pain medications which were reportedly sedating was also cited as a factor impeding the claimant's ability to work, as was "some decrease in sensorium" which reportedly caused her to drop things and limited her reaching, handling, feeling and pushing/pulling activities. I find that this treating nurse practitioner did not adequately examine the claimant and report significant functional limitations which would support this opinion. I further find that this source inappropriately relied almost exclusively on the claimant's subjective complaints in forming this opinion of her ability to sustain work activity, completely ignoring or remaining ignorant of the opinion of the claimant's neurosurgeon that she was able to resume normal activities without significant functional limitations. . . .
>
> . . . .
>
> In addition, the nurse practitioner again completed a form in April 2006 indicating that the claimant could now only lift/carry 5 pounds occasionally and frequently, that she could only stand/walk for 1 to 2 hours total in an 8-hour workday and for ¼ of an hour without interruption, that she could only sit for ½ hour without interruption and had to "be able to get up and walk around," with no reported limitation on her total tolerance for sitting in an 8-hour work day, and that she could only occasionally stoop and never engage in other postural maneuvers. The same restrictions on manipulative activities that the nurse practitioner had previously identified were reiterated, and the functional

limitations were again attributed to sedating medications and chronic pain which was expanded from the cervical area to include the lower levels of the spine.

. . . .

The claimant's neurologist also completed a form [in February 2007] indicating that her diagnosed cervicalgia caused severe neck pain, marked rigidity of the neck muscles, an inability to perform "low stress" jobs, an inability to walk, and an inability to sit or stand for more than 20 minutes at a time each. In addition, the neurologist opined that she had to walk every 15 minutes despite previously indicating that she could not walk even 1 city block. The doctor declined to estimate the claimant's tolerance for other activities, including her ability to sit, stand and walk throughout an entire 8-hour work day, and he also failed to report any treatment side effects. However, he further opined that the claimant could not lift/carry any amount of weight and reported that she could be expected to miss work 1 to 2 times per month while declining to suggest any specific limitations on her ability to use her upper extremities for manipulative activities.

I find that the treating neurologist's opinion of the claimant's functional capacity is incomplete, as well as inconsistent (with respect to her reported inability to walk at all versus her reported need to walk 15 minutes periodically). . . .

. . . .

In November 2007, the claimant underwent a consultative physical examination in connection with the remand of her cause. . . . In addition, this examining source opined that she had a "fear avoidance of activity" and had thus reduced herself to less than sedentary activity levels while taking several sedating and addicting medications.

The consultative examiner also noted . . . that her pain complaints were "out of proportion to her physical findings and diagnostic studies." Overall, this examining source found it "difficult to comprehend her self-perceived degree of functional limitation given her [reported] work injury and single level anterior cervical fusion." Overall, the claimant was felt to be capable of lifting/carrying up to 20 pounds occasionally and 10 pounds frequently, of sitting 4 hours total and 2 hours at a time, of standing 2 hours total and 30 minutes at a time, of walking 2 hours total and 30 minutes at a time, of ambulating without the need for a cane in the complete absence of any physiological weakness or loss of balance, of occasionally reaching and frequently performing other manipulative activities, and of frequently using her feet for operating foot controls. "Chronic pain

14

syndrome and self-perceived disability" were felt to limit climbing of stairs and ramps, balancing and stooping to occasionally, and all other postural maneuvers were felt to be contraindicated.  Additional environmental and other limitations were also reported, with the latter again being attributed to "self-perceived disability[.]"

The claimant also complained of having sleep disturbances due to pain when she returned to her treating neurologist in November 2007, but her neurological evaluation was again completely normal. . . . [S]he was only using her antidepressant medication "as needed.["] . . .

. . . .

. . . Dr. Raulston also noted that the consultative examiner in late 2007 had difficulty determining the cause of the claimant's symptoms and agreed with this examining source that the claimant's functional limitations appear to be the result of her 'self-perceived disability,' not any objective physiological problem.

Based upon the objective clinical evidence of record, the Medical Expert concluded that the claimant retains the capacity to perform the range of work specified below.  However, Dr. Raulston also opined that the claimant's preoccupation with her self-perceived limitations could preclude her from sustaining competitive employment.  Upon cross-examination, he also acknowledged that she has a history of heavy narcotic use and that side effects from this could affect her ability to sustain work activity. . . .

. . . I further find that the claimant's diagnosed depression and anxiety have not, for any sustained period of at least 12 continuous months, caused more than mild limitations in her daily activities, social functioning, concentration, persistence and pace, no prolonged episodes of decompensation, no "marginal adjustment," no need for a highly supporting living arrangement and no complete inability to function outside the area of her own home under the provisions of §§ 12.04 and/or 12.06, respectively, of the Listing.  Thus, these are not "severe" impairments within the meaning of the Act.

(Tr. 21-31 (internal citation omitted).)

Next, the ALJ found that none of Hudspeth's impairments met or equaled the severity of any impairment in the Listing.  (Tr. 21, 31.) The ALJ further found that Hudspeth's testimony concerning her condition was not credible or reasonably supported by the objective medical

15

evidence "to the extent she has alleged the inability to engage in any work activity since September 1, 2003." (Tr. 31.) In reaching this determination, the ALJ considered multiple factors in accordance with 20 C.F.R. §§ 404.1529 and 416.292 and SSR 96-7p, including the type, dosage, effectiveness and side effects of medications taken to alleviate pain or other symptoms. (Tr. 32.) Specifically, the ALJ considered that Hudspeth was taking multiple major narcotic medications, Neurontin, nonsteroidal anti-inflammatory pain medication, muscle relaxants, and antidepressant medication. (*Id.*) The ALJ noted that the nurse practitioner had reported on multiple occasions that Hudspeth's medications were very sedating although there were few reports that Hudspeth had reported being sedated to any physician, no evidence of memory impairment or other evidence of severe sedation, and no reports of any physician observing Hudspeth to be excessively sedated. (*Id.*)

As to Hudspeth's RFC, the ALJ stated:

> The claimant has retained the residual functional capacity to perform, on a continuing and sustained basis, the exertional and nonexertional requirements of sedentary work activity which affords the intermittent opportunity to alternate between sitting and standing in the performance of work duties.

> Sedentary work involves the lifting of no more than 10 pounds at a time with the occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves mostly sitting, a certain amount of walking and standing are often necessary in carrying out job duties. Jobs are considered sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> After thorough review of the evidence, I conclude that the objective evidence fails to establish that the claimant has any significant restriction in her residual functional capacity to perform work consistent with the above definition and limitation, despite her subjective complaints. In so finding, I have afforded the claimant the benefit of every doubt with respect to her complains of severe chronic upper extremity, neck, and back pain, and I have therefore limited her, in accordance with the Medical Expert's testimony, to lifting/carrying no more than

16

10 pounds occasionally and less than that frequently. In light of her complaints that she cannot tolerate standing and walking activities for long, I have limited her to performing these activities for no more than 2 hours during an 8-hour work day provided that she has the intermittent opportunity to alternate between sitting and standing for comfort. Further, although she has asserted that she cannot sit long, I conclude that the objective clinical evidence of record fails to corroborate that her degenerative disk disease significantly limits sedentary postural positions and I find that she can sit for 6 hours in an 8-hour work day as long as she has the intermittent opportunity to alternate between sitting and standing for comfort. I also accept the Medical Expert's testimony that the claimant can occasionally climb, balance and kneel, and that she cannot crawl, crouch and stoop, and I find that this is consistent with a conclusion that she can sustain sedentary work activities. I also accept Dr. Raulston's evaluation of the claimant's tolerance for manipulative activities (no limitations except a restriction to occasionally reaching overhead), workplace hazards (no limitations) and environmental needs (no limitations), and I find that these limitations, along with a restriction to lifting overhead only occasionally, are not inconsistent with the capacity to perform sedentary work activity.

I also conclude that the objective clinical evidence of record fails to reflect any significant mental/emotional abnormalities, despite her apparent preoccupation with the perception of pain and disability. I therefore find that the claimant's medically determinable impairment does not impose additional functional restrictions to those specified above.

(Tr. 33-34 (internal citations omitted).)  Based on the RFC assessment, the ALJ opined that

Hudspeth was able to perform her past relevant work. (Tr. 35.)  Consequently, the ALJ found

Hudspeth was not disabled. (Tr. 35.)

E.     Discussion

    1.   Mental Illness

In her brief, Hudspeth argues that the "ALJ did not properly consider the severity of

Plaintiff's mental impairment" at Step Two of the sequential evaluation process. (Pl.'s Br. at 4.)

Specifically, Hudspeth claims that the ALJ, acknowledging various references to her mental

impairments throughout the record, improperly concluded that "these impairment[s] result in no

17

more than mild limitations in the domains of social functioning, activities of daily [living], and concentration persistence and pace, and result in no prolonged episodes of decompensation." (*Id.*) Hudspeth argues that such conclusion is not supported by substantial evidence. (*Id.*)

Hudspeth also argues, in essence, that there is evidence in the record that Hudspeth's self-perception of her disability is in itself disabling and that the ALJ incorrectly interprets statements related to Hudspeth's self-perceived disability as a lack of credibility rather than evidence of a disabling mental impairment. (Pl.'s Br. at 5.) Hudspeth claims that the ALJ was obligated to develop the record "[t]o the extent the ALJ was unsure of the affect of Plaintiff's mental limitations on her ability to work." (Pl.'s Br. at 6.)

Federal regulations require that the ALJ follow mandatory steps when evaluating the severity of mental impairments in claimants. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). In evaluating mental disorders, the ALJ first considers whether a claimant has a medically determinable mental impairment. *See* 20 C.F.R. Pt 4, Subpt. P, App. 1 § 12.00; 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). The regulations require the ALJ to evaluate the degree of functional loss resulting from the claimant's mental impairments. 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). If an impairment is found, the ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).[5]   The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described.  20 C.F.R. §§ 404.1520a(e), 416.920a(e).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment.  20 C.F.R. §§ 404.1520a(d), 416.920a(d).  If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at Step Two of the sequential evaluation process, which generally concludes the analysis and terminates the proceedings.  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).  The regulations contain a presumption that if the claimant's degree of limitation is rated as none or mild in the first three functional areas and as none in the fourth area, the ALJ will generally conclude that the claimant's mental impairment is not severe. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).  However, this presumption may be rebutted if "the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." *Id.*; *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (establishing the following standard for determining whether a claimant's impairment is severe:  An impairment is not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience); *White v. Astrue*, No. 4:08-CV-415-Y, 2009 WL 763064, at *9-10  (N.D. Tex. March 23, 2009) (refusing to accept the claimant's argument

---

[5] The degree of limitation in the first three functional areas is rated on a five-point scale, which includes none, mild, moderate, marked, and extreme.  20 C.F.R. § 404.1520a(c)(4).  The degree of the fourth functional area is rated on a four-point scale which includes none, one or two, three, and four or more.  *Id.*

that the "ALJ's finding is contrary to *Stone*, because the ALJ, in applying the special technique
[set forth in the regulations for evaluating mental impairments], found mild deficits in her
concentration, persistence or pace, as well as social functioning").

In this case, the ALJ found that Hudspeth's depression and anxiety caused no more than
mild limitations in her daily activities, social functioning, concentration, persistence and pace
and no prolonged episodes of decompensation.  In making this finding the ALJ went through a
thorough and extensive review of the medical evidence in the record, specifically noting, *inter
alia*, the following evidence that related to Hudspeth's alleged mental impairment: (1) in
September 2003 Hudspeth was diagnosed with an anxiety reaction for which no medication was
offered (Tr. 21), (2) notations by the nurse practitioner that Hudspeth was taking Xanax and
Valium for anxiety (Tr. 22, 27), (3) examination in November 2007 in which Brandecker, the
consultative examining source, opined that Hudspeth had a "fear avoidance of activity" and,
consequently, had "reduced herself to less than sedentary activity levels" and that Hudspeth's
complaints of pain were "out of proportion to her physical findings and diagnostic studies" (Tr.
29), (4) Hudspeth's report to her treating neurologist in February 2008 that she was only using
her antidepressant medication as needed (Tr. 29), and (5) testimony from Raulston, the ME, that
Hudspeth's functional limitations appeared to be the result of self-perceived disability and not
any objective physiological problem (Tr. 30).

In this case, the ALJ, as required by the regulations, made specific factual findings in the
four broad functional areas in evaluating Hudspeth's impairments.  In making such findings, the
ALJ relied on the evidence in the record, none of which indicated that Hudspeth's *mental*
impairments, as opposed to her physical impairments, were causing more than mild limitations in

20

the first three functional areas and no limitations in the fourth area.  Consequently, the ALJ, as per the presumption in the regulations, was entitled to conclude that Hudspeth's mental impairments were not severe, unless the evidence indicated that there was more than a minimal limitation in her ability to do basic work activities.

Hudspeth attempts to make such a showing by pointing to evidence in the record indicating that she was diagnosed with anxiety, depression, or both, or was taking antidepressant medication.  (Pl.'s Br. at 4.)  Although the Court agrees that such evidence does exist in the record, this evidence merely shows that Hudspeth suffered from anxiety and depression but does not that show that such mental impairments caused more than a minimal limitation in her ability to do basic work activities.  Because substantial evidence exists supporting the ALJ's decision that Hudspeth's mental impairments were not severe and the ALJ made such a determination in accordance with the procedure set forth in the regulations, the Court concludes that remand is not required.

As to Hudspeth's claims that the evidence in the record regarding a "self-perceived disability" placed a duty on the ALJ to more fully develop the record to determine whether such limitations affected her ability to work, the Court recognizes that the ALJ has a duty to develop the facts relative to a claim for benefits fully and fairly.  When the ALJ fails in this duty, he does not have before him sufficient facts on which to make an informed decision and his decision is not supported by substantial evidence.  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984).  Nonetheless, reversal is appropriate only if the claimant shows that he was prejudiced as a result of the insufficient record. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane*, 731 F.2d at 1220.  "To establish prejudice, a claimant must

show that he could and would have adduced evidence that might have altered the result." *Brock*, 84 F.3d at 728.

In this case, Hudspeth has not made such a showing. Hudspeth has not demonstrated, beyond her own unsupported speculation, any additional evidence that would have caused the ALJ to impose greater functional limitations on Hudspeth than those originally found by the ALJ. Instead, the record indicates that, at most, Hudspeth suffers from depression, anxiety, and a perception that her physical impairments and pain are much more disabling than her actual physical impairments or pain and that no treatment, beyond medication, has been recommended for such mental impairments. The ALJ properly took such evidence into account at each step of the sequential evaluation process. Because substantial evidence supports the ALJ's decision, as noted above, that Hudspeth's mental impairments are not severe and she has not shown that she could and would have adduced additional evidence that might change such result, the Court concludes that the ALJ did not violate his duty to more fully develop the record.

2.  Residual Functional Capacity

Hudspeth also claims that the ALJ erred by failing to include all of Hudspeth's impairments, including those that were not severe, into his RFC assessment. (Pl.'s Br. at 6-7.) Specifically, Hudspeth claims that the ALJ erred by failing to include the following in his RFC assessment: (1) any limitations associated with her mental impairments and (2) a "limitation on Plaintiff's ability to reach" that was found by Brandecker. (Pl.'s Br. at 7.) In addition, Hudspeth argues that the ALJ erred by "failing to include Plaintiff's medication side-effects in his RFC finding." (Pl.'s Br. at 8.)

22

RFC is what an individual can still do despite her limitations.[6]  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  *Id.  See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.*  RFC is not the least an individual can do, but the most.  SSR 96-8p at *2.  The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered and is based upon all of the relevant evidence in the case record.  *Id.* at *3-5. The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence.  *Id.* at *7.  In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe.  *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5.  The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence.  *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).  The ALJ is not required to

---

[6] The Commissioner's analysis at Steps Four and Five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005).  The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

In this case, the ALJ determined that Hudspeth had the RFC to perform sedentary work, which would provide Hudspeth with the "intermittent opportunity to alternate between sitting and standing in the performance of work duties." (Tr. 33.)  In addition, the ALJ, based on a "thorough review of the evidence," limited Hudspeth as follows: lifting and carrying no more than ten pounds occasionally and less than that frequently; standing and walking for no more than two hours during an eight-hour work day provided that Hudspeth had the opportunity to alternate between sitting and standing; sitting for six hours in an eight-hour work day as long as she had the intermittent opportunity to alternate between sitting and standing; occasionally climbing, balancing, kneeling, reaching and lifting overhead; and never crawling, crouching. (Tr. 34.)  The ALJ, stating that "despite [Hudspeth's] apparent preoccupation with the perception of pain and disability," did not impose any additional functional restrictions for Hudspeth's alleged mental impairments. (*Id.*)

In support of his RFC assessment, the ALJ considered, *inter alia*, the following: (1) the ME's testimony that Hudspeth can lift or carry no more than ten pounds occasionally and less than that frequently and that she can occasionally climb, balance, and kneel but never crawl, crouch, or stoop, and can only occasionally reach and lift overhead, (2) Hudspeth's complaints that she cannot tolerate standing and walking activities for very long, and (3) the objective medical evidence showing that Hudspeth's degenerative disk disease does not significantly limit sedentary postural positions. (Tr. 34.)

24

In this case, the record indicates that the ALJ did specifically consider whether to include any limitations due to Hudspeth's mental impairments but did not find that any such limitations were supported by the evidence in the record. (Tr. 34.) In addition, contrary to Hudspeth's arguments, the ALJ did incorporate at least part of Brandecker's limitation on Hudspeth's ability to reach into his RFC determination as the ALJ specifically limited Hudspeth to only occasional reaching and lifting *overhead.*[7] (Tr. 34.) The ALJ discussed the evidence in the record in making his RFC determination, adequately explained the reasoning for his RFC determination and for giving less weight to certain evidence, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Because there is substantial evidence in the record that supports the ALJ's RFC assessment, the Court concludes that the ALJ did not err by failing to appropriately consider all of the functional limitations imposed by Hudspeth's impairments. Consequently, the Commissioner's decision should be affirmed.

Hudspeth also argues that the ALJ erred in assessing her RFC because he failed to consider the side effects caused by the various prescription medications that she was taking. (Pl.'s Br. at 8.) According to 20 C.F.R. § 404.1529(c)(3)(iv), the ALJ is required as part of the

---

[7] Hudspeth claims that her ability to reach only occasionally would prevent her from performing her past relevant work as an appointment clerk, which requires frequent reaching. (Pl.'s Br. at 7.) The Court disagrees for several reasons. First, the Court notes that the VE actually used the term "apartment clerk" or "secretary" to describe Hudspeth's past relevant work (as opposed to the term appointment clerk used by the ALJ and Hudspeth). (Tr. 559.) Furthermore, in response to a question from Hudspeth's attorney at the May 24, 2006 hearing before the ALJ, the VE stated that the job of a secretary, apartment clerk, or tenant clerk does *not* "have a requirement of bilateral manual dexterity for reaching." (Tr. 561-62.) In addition, contrary to Hudspeth's claims, there is no clear indication that frequent reaching is required under the Dictionary of Occupational Title codes related to either an appointment clerk or an apartment clerk. *See Dictionary of Occupational Titles* §§ 201.362-030, 237.367-010 (rev. 4th ed. 1991).

disability determination to consider "the type, dosage, effectiveness, and side effects of any medication" a claimant takes or has taken to alleviate his pain or other symptoms. *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999). Thus, an ALJ commits error when a claimant complains of the symptoms or side effects of a medication and the ALJ fails to evaluate those side effects and their impact on the claimant's RFC. *See Brown v. Barnhart*, 285 F. Supp. 2d 919, 935 (S.D. Tex. 2003).

In this case, contrary to Hudspeth's allegations, the ALJ did consider the side effects of the medications Hudspeth was taking.[8] In his opinion, the ALJ cited directly to 20 C.F.R. §§ 404.1529 and 416.929 and mentioned that he had an obligation to consider, as one factor, "the type, dosage, effectiveness and side effects of medications taken to alleviate pain or other symptoms." (Tr. 32.) In this regard, the ALJ then noted the following regarding Hudspeth's medications:

> Multiple major narcotic medications over time, with Neurontin, nonsteroidal anti-inflammatory pain medication, muscle relaxants and antidepressant medication, with reportedly poor results: multiple reports from the nurse practitioner that the claimant's medications are very sedating with relatively few reports that the claimant actually reported being sedated to any physician, no evidence of memory impairment or other indicia of severe sedation, and no reports of any physician observing her to be excessively sedated.

(Tr. 32.)

Based upon this statement, it is apparent that one reason the ALJ gave little weight to the reported side effects of Hudspeth's medications was because most of the opinions regarding such alleged side effects were from Hilliard, Hudspeth's treating nurse practitioner. In accordance

---

[8] The ALJ specifically considered the side effects of Hudspeth's medications when he was evaluating Hudspeth's credibility. (*See* Tr. 31-33.) In addition, the evidence indicates that the ALJ took such side effects into consideration when he assessed Hudspeth's RFC as he had previously gone through an exhaustive recitation of all the evidence, including Hudspeth's claimed side effects, prior to formulating her RFC.

with the law and regulations, the ALJ had previously determined that Hilliard's opinions were not entitled to much weight. (*See, e.g.*, Tr. at 24-25.) Because the ALJ did properly discuss the side effects of Hudspeth's medications and substantial evidence supports his conclusions regarding such side effects, the Court concludes that the ALJ did not err regarding this issue.

## II. RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONAND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The Court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until July 22, 2010. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

IV. ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until July 22, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED July 2, 2010.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv